IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| ALICE LOUISE WOODS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:02-CV-0185 |
| | § | |
| JO ANNE B. BARNHART, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION**
**TO REVERSE THE DECISION OF THE COMMISSIONER**
**AND REMAND FOR FURTHER ADMINISTRATIVE ACTION**

Plaintiff ALICE LOUISE WOODS brings this cause of action pursuant to 42 U.S.C.

§ 405(g), seeking review of a final decision of defendant JO ANNE B. BARNHART,

Commissioner of Social Security (Commissioner), denying plaintiff's application for

supplemental security income (SSI).  Both parties have filed briefs in this cause.  For the reasons

hereinafter expressed, the undersigned United States Magistrate Judge recommends the

Commissioner's decision finding plaintiff not disabled and not entitled to benefits be

REVERSED and the case be remanded for further administrative action.

I.
PROCEEDINGS

Plaintiff applied for SSI benefits on June 24, 1998, alleging she became disabled and,

thus, unable to work, on February 1, 1993.[1]  (Tr. 12, 89-90).  Plaintiff described her disabling

condition as heart problems, numbness on her right side, aches on the left side of her body,

major depression, and carpal tunnel syndrome in both wrists.  (Tr. 115).  In describing how her

condition limited her ability to work, plaintiff stated, "Not able to sit, stand nor walk for long

periods of time.  Become tired, pain in left side of my body becomes excruciating, develop

shortness of breath, headaches, left leg sometimes gives out.  Also have diagnosis of major

depression - affects ability to concentrate, focus, make decisions, disturbed sleep, thoughts of

self harm, irritability and impaired memory."  Plaintiff further remarked that she "[c]an only

stand for about one hour.  My left leg usually gives out.  Leg hurts and aches before giving out.

Left leg usually swells from feet to hip.  Neck and shoulder also hurt when leg swells."  (Tr.

126).  Plaintiff attested her condition first bothered her on November 7, 1993 and caused her to

stop working that same date.  (Tr. 115).  Plaintiff noted she completed the 11th grade, and

identified past work as a food server/housekeeper (1996 - two days only), a

housekeeper/launderer (1991), a stocker (1984-1985), and an assembly line worker (1980).  (Tr.

121-25).  At the time she filed her application, plaintiff was 41-years-old.  (Tr. 89).

On January 14, 1999, the Social Security Administration denied plaintiff benefits

determining plaintiff's condition was not severe enough to keep her from working.[2]  (Tr. 70-76).

On June 28, 1999, the Administration denied plaintiff benefits upon reconsideration.  (Tr. 78-

---

[1]A prior application for SSI benefits, filed March 10, 1994, was denied by an ALJ and a subsequent denial of review by the Appeals Council on June 28, 1996.  Consequently, the parties concede the earliest possible disability onset date in this petition is June 29, 1996, the day following the prior ALJ decision.

[2]The Administration found plaintiff's condition was not severe enough to be considered disabling, finding plaintiff's depression, heart, carpal tunnel, left leg, breathing and headache problems had not caused any "serious complications."  The Administration further found the evidence did not show plaintiff has the various limitations she described as being caused by her symptoms.  The Administration concluded her overall medical condition did not limit her ability to work.  (Tr. 75-76)

80).[3]

On September 12, 2000, an Administrative Law Judge ("ALJ") conducted an administrative hearing in this case.[4]  (Tr. 23-51).  On December 28, 2000, the ALJ rendered an unfavorable decision, finding plaintiff not disabled at any time through the date of the decision.  (Tr. 9-20).  The ALJ determined plaintiff has the medically determinable impairments of depression, heart and back problems, and carpal tunnel syndrome that are considered "severe."  The ALJ found plaintiff "has not had any disorder or combination of disorders meeting or equaling in severity any of those described in the Listing of Impairments, Subpart P, Appendix 1, Social Security Regulations No. 4."  (Tr. 13).  The ALJ noted he specifically reviewed Sections 1.00, 4.00 and 12.00 of the listing-level impairments.  The ALJ further found that although plaintiff has symptom-producing problems, her testimony and other evidence did not "credibly establish functional limitations to the extent alleged."  After detailing plaintiff's medical record, symptoms, and complaints, the ALJ determined plaintiff retained the residual functional capacity (RFC) for a restricted range of sedentary work.  Specifically, the ALJ found plaintiff's overall condition did not preclude her from performing simple, unskilled, non-public work at a sedentary exertional level.  (Tr. 17, 18, 19).  Based on this RFC, and upon vocational expert testimony, the ALJ found plaintiff could not return to work she had performed in the past, *viz.*, as a housekeeper, stocker, and assembly line worker.  (Tr. 19).  The ALJ then determined there was

---

[3]The Administration found plaintiff's condition was not severe enough to be considered disabling, noting that while her depression, chest pain, heart, breathing, leg and hip conditions "may require special care and treatment," the evidence did not show her ability to perform basic work activities was as limited as she indicated.  The Administration concluded plaintiff's overall medical condition did not limit her ability to work.  (Tr. 80).

[4]In her request for an administrative hearing, plaintiff alleged her pain had progressed throughout her body, accompanied by a bad headache.  (Tr. 84-85).  She also averred that on some days, the "pain is unbearable" and is not controlled by  medication.

other work existing in significant numbers in the regional and national economy which plaintiff could perform with her RFC, age and education, *viz.*, surveillance system monitor and pager. (Tr. 19-20).  The ALJ thus concluded plaintiff was not under a disability at any time through the date of his decision.  (Tr. 20).

Upon the Appeals Council's denial of plaintiff's request for review on May 3, 2002, the ALJ's determination that plaintiff is not under a disability became the final decision of the Commissioner.  (Tr. 6-7).  Plaintiff now seeks judicial review of the denial of benefits pursuant to 42 U.S.C. § 405(g).

## II.
## ISSUES

The ALJ made the determination that plaintiff is not disabled at Step Five of the five-step sequential analysis.  Therefore, this Court is limited to reviewing only whether there was substantial evidence in the record as a whole supporting a finding that plaintiff retained the ability to perform other work that exists in significant numbers in the national economy, and whether the proper legal standards were applied in reaching this decision.  To this extent, plaintiff presents the following issues:

1.  The ALJ's finding as to plaintiff's residual functional capacity (RFC) is not supported by substantial evidence because:

   a.  the ALJ did not specifically address plaintiff's numbness in her hands; and

   b.  the ALJ did not address plaintiff's deficiencies in concentration or cite to her GAFs in the 40-50 range.

III.
FINDINGS AND CONCLUSIONS

The ALJ found plaintiff is limited to the performance of simple, unskilled sedentary work, can lift a maximum of 10 pounds, can only sit or stand for about one hour at a time, thereby requiring the ability to change positions frequently, can only occasionally perform postural maneuvers, such as kneeling, climbing, crouching, bending and crawling, and cannot do work that requires much public contact because of limitations in social functioning.  (Tr. 19). Based on VE testimony considering these limitations, the ALJ found plaintiff cannot perform any of her previous jobs, but can perform other jobs which exist in significant numbers in the regional and national economy.  Plaintiff contends the ALJ's above finding as to plaintiff's RFC is not supported by substantial evidence.

A.  Hand Use

In her first ground, plaintiff argues the ALJ erred when he found no limitations as to the manipulative use of her hands, specifically attributing error to the ALJ's failure to find plaintiff's ability to work is limited by numbness of the right thumb area.[5]  Plaintiff points to the ALJ's failure to reference, in his discussion of the medical evidence, a May 9, 1995 CT myelogram of the cervical spine which noted both skeletal and neurological abnormalities at C5-6, as well as mild spinal cord atrophy, two (2) years after surgical treatment.[6]  (Tr. 330-31).  Plaintiff argues

---

[5]Plaintiff testified "the majority of time" when she picks something up, her hand will "give out," clarifying that it is "mostly" her right hand, and that her thumb and "all this" is numb.

[6]The CT revealed the presence of "advanced spondylotic and osteoarthritic degenerative changes," "anterior and posterior osteophytes," and "relative foraminal narrowing on the right with poor filling of the C6 root sleeves bilaterally, particularly on the right" at the C5-6 level.  The CT also revealed similar findings at the C6-7 level, with a finding that the spinal cord appeared mildly atrophic.

this medical record demonstrated plaintiff's right thumb area numbness limitation because the C6 nerve innervates the area on the outside of a person's arms, including the thumbs.  Plaintiff also points to the ALJ's failure to cite a February 19, 1996 motor and sensory nerve conduction test and routine needle EMG examination which revealed "[g]eneralized sensory peripheral neuropathy which involved many of the sensory nerves sampled in the arms and legs.  Changes appear to be moderate in degree."[7]  Plaintiff acknowledges she has normal grip <u>strength</u> (and that the ALJ correctly noted physicians' findings of seemingly normal grip strength), but contends she has no <u>sensation</u> in her right thumb area.  Plaintiff contends the ALJ chose to rely only on the evidence which supported his conclusion, and disregarded the May 1995 and February 1996 medical evidence cited above.  Plaintiff argues the May 1995 and February 1996 evidence showed an impairment to exist which could cause right thumb area numbness and, thus, the ALJ was required to carefully evaluate those allegations.  Plaintiff maintains the ALJ's evaluation of her complaint, *to wit*:  "The record does not indicate a significant degree of dysfunction in the claimant's use of her hands," was insufficient.  Plaintiff disputes the November 17, 1998 finding of one of defendant's "one-shot" consultative examiners (an internal medicine specialist) that plaintiff was "able to . . . handle objects . . . without problems" because it is unclear what extent the examiner "looked into this issue" and because the examiner did not indicate he was aware of the results of the May 1995 CT scan and the February 1996 EMG test.  Plaintiff thus concludes there is insufficient evidence to support the ALJ's finding that she has no significant degree of dysfunction of her hands.

---

[7]The NCV/EMG also revealed "[n]o electrical evidence of entrapment neuropathy of any of the nerves sampled," and "[n]o electrical evidence of a superimposed cervical radiculopathy on the right."

In response, defendant notes the May 9, 1995 and February 19, 1996 medical evidence upon which plaintiff relies is outside the relevant time period (between June 29, 1996 and December 28, 2000) and, thus, cannot support plaintiff's allegation that she is impaired by right thumb area numbness.  Even if the out-of-time evidence were considered, defendant argues the evidence does not support plaintiff's claim of disability.  Defendant contends the evidence merely showed that in 1995-1996, plaintiff had some peripheral neuropathy, a condition the ALJ acknowledged in his decision, and did not show plaintiff was disabled by carpal tunnel syndrome (CTS).  Defendant argues the ALJ properly determined any CTS experienced by plaintiff was not disabling.

Defendant further maintains the medical evidence for the relevant time period of June 29, 1996 to December 28, 2000 does not show any problems with plaintiff's hands.  Specifically, defendant argues the objective evidence of record does not show plaintiff lacks <u>strength</u> in her hands or has disabling <u>weakness</u> in her hands.  Defendant cites the refuted November 17, 1998 examination of plaintiff by a consulting physician where plaintiff's strength in her upper extremities was normal, strength, coordination, and motion in her hands were normal, plaintiff was able to handle objects without problems, plaintiff could lift and carry 5-6 pounds, and there was no evidence of focal motor abnormalities, especially in the upper extremities.  (Tr. 154-57).[8]

Defendant also challenges plaintiff's argument that the ALJ selectively chose which evidence to rely upon, and argues the ALJ considered all of the relevant evidence.  Defendant acknowledges plaintiff was diagnosed with CTS in 1996, but notes the record contains very little

---

[8]Although not cited by defendant in her response, the undersigned also notes the March 3, 2000 medical record cited by the ALJ wherein plaintiff's strength was equal in both upper extremities, including hand grip.

evidence that plaintiff was actually treated for CTS.  Defendant argues there is considerable

doubt as to the severity of any CTS plaintiff may experience because her physician does not even

mention this alleged impairment in most of the medical evidence plaintiff has presented for

1998-1999.   Defendant concludes there was substantial evidence in the record to show plaintiff

does not have a physical impairment of the hands, *i.e.*, numbness, rendering her unable to

perform sedentary work.

Acknowledging the medical evidence demonstrates normal hand strength and/or grip,

plaintiff argues the medical records demonstrate an impairment of numbness in her right thumb

area which should have been discussed and evaluated more thoroughly by the ALJ, and which

limitation should have been included in plaintiff's RFC.  The medical records plaintiff cites are,

in fact, outside the relevant time period here involved.  Medical records cited by the ALJ and

defendant do not make any reference to, or diagnosis of, right hand or thumb numbness, instead

finding only normal hand strength and/or grip.  As with any social security case, the statutorily

mandated function of the ALJ includes weighing the evidence and assessing the credibility of the

witnesses.  *Chaparro v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987) ("The Secretary, not the

courts, has the duty to weigh evidence, resolve material conflicts in the evidence, and decide the

case.").  Here, the ALJ's finding that the "record does not indicate a significant degree of

dysfunction in [plaintiff's] use of her hands" is supported by substantial evidence, including the

challenged November 17, 1998 consultative examination.  This Court is not permitted to re-

weigh that evidence.  Additionally, plaintiff has not demonstrated the numbness in her right

thumb area would have altered the ALJ's RFC finding that plaintiff can perform sedentary work,

or how such a limitation would have reduced her ability to perform work as a surveillance

system monitor or pager.  Therefore, the ALJ's decision that plaintiff's RFC is not limited by the use of her hands is supported by substantial evidence.  Plaintiff's first ground should be DENIED.

## B.  Mental RFC

In her second ground, contending the only mental limitation found by the ALJ was a limitation in plaintiff's social functioning, plaintiff argues the ALJ erroneously failed to find plaintiff has limitations in concentration which would limit her RFC.  Plaintiff contends her testimony and medical evidence of record demonstrates she has deficiencies in concentration. (Citing Tr. 33, 211, 212, 216, 235, 420, 430).  Citing SR 86-8,[9] plaintiff argues the ability to concentrate is distinguishable from the ability to understand, remember and carry out instructions, and concentration abilities must be considered when a mental impairment is present. Plaintiff contends the finding of defendant's consultative examiner that plaintiff could "maintain her focus very well based on my observation of her behavior during this interview," was far outweighed by the observations of plaintiff's long-time treating psychiatrist.

Plaintiff also argues that while the ALJ cited plaintiff's GAFs in the range of 50-60, it was error for him to fail to even acknowledge or, more importantly, to attribute any significance to, her GAFs in the range of 40-50, which indicated a considerably more serious degree of

---

[9][W]hen an individual has a combination of exertional and nonexertional impairments, the rules are used as a frame of reference for determining "disability." The exertional impairment is considered first under the applicable rule, and then the additional restriction(s) imposed by the nonexertional impairment is considered. When an individual has a solely nonexertional impairment, the principles established in the regulations are applied in determining "disability," giving consideration to the rules for specific case situations described in Appendix 2 (i.e., use of the rules as a frame of reference). When the nonexertional impairment is a mental impairment, the <u>ability to concentrate</u>, to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers, and pressures in a work setting are considered. (See Regulations Nos. 4 and 16, sections 404.1545(c) and 416.945(c)) (emphasis added).

impairment.[10]

Defendant argues the ALJ did, in fact, acknowledge plaintiff's mental impairment and its effect on her RFC, noting in his decision that plaintiff would only be capable of performing basic work activities such as understanding, remembering and carrying out simple job instructions. Defendant maintains the ALJ considered plaintiff's lifestyle and the jobs the VE identified as essentially consistent with her sedentary lifestyle.  Defendant further argues the ALJ considered the medical evidence from plaintiff's treating sources and properly found plaintiff was not disabled by a mental impairment.  Defendant concludes the ALJ's finding was consistent with substantial evidence of record.  Specifically, defendant argues the objective evidence shows an improvement in plaintiff's condition with treatment (citing Tr. 429, 434, 474), and that plaintiff's psychiatrist did not ever report plaintiff was disabled by her condition.  Further, defendant argues plaintiff's testimony demonstrated her mental condition was not disabling in that she had been working as a cleaning lady every other day for a couple of hours each day and was able to wash dishes, clean bathrooms, and cook – activities which defendant asserts are not indicative of a disabled individual.  Defendant concludes there was substantial evidence in the record to show plaintiff does not have a mental impairment rendering her unable to perform sedentary work.

Plaintiff contends the following testimony amounted to evidence of an additional existing mental impairment of loss of concentration which should have been included in plaintiff's RFC:

> Q      On your depression, what sort of trouble is that giving you now?  Are you taking
>        medication for it?

---

[10]GAF refers to the Global Assessment Functioning Scale which ranges from 1, persistent danger of severely hurting self or others, or unable to care for herself, to 100, superior functioning.  The GAF scale goes from 0 to 100.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., text revision 2000) at 34.

A       Yes, I am.

Q       And are you seeing a psychiatrist fairly regularly?

A       Yes.

Q       Does the medication seem to be helping you?

A       At times.

Q       What kind of troubles are you still having, if any, from what you think is
        from that?

A       Loss of concentration, forgetful.

Q       Can you give us an example of any one of those?  Lack of concentration?
        What makes you think you have trouble concentrating?

A       I can't think very well on a lot of things.  [INAUDIBLE]  I can't think of
        like [INAUDIBLE].  I'll start doing one thing and forget –

Q       Do you find yourself having to make a list?

A       Yeah.  A lot.

Q       Did you used to?

A       No.

As medical evidence of an additional existing mental impairment of loss of concentration

which should have been included as a limiting factor in plaintiff's RFC, plaintiff cites the Court

to a Treatment Plan/Diagnostics form which included, in its plan for treatment, the need to

"reduce and eliminate symptoms of . . . [plaintiff's] inability to concentrate."  (Tr. 235, March

30, 1998).   Plaintiff also cites as medical evidence of an existing mental impairment of loss of

concentration, three (3) medication follow-up forms which include a notation of "Concen ↓."

(Tr. 216, January 12, 1999; 211, May 12, 1999; Tr. 420, June 8, 2000).  Plaintiff also cites to

another medication follow-up form which includes a notation of "Concen BAD."  (Tr. 430,

December 2, 1999).[11]

While the undersigned does not necessarily find the medical record evidence cited by plaintiff establishes the existence of a limiting mental impairment of inability to concentrate, to the degree it is irrefutable, there was sufficient evidence of a mental impairment relating to concentration to require the ALJ to address and evaluate this medical evidence which indicates plaintiff's reduced degree of concentration, whether such is a symptom of her depression or is an independent mental impairment itself.  Consequently, on remand, the defendant should evaluate this particular evidence and reach a determination as to the significance of plaintiff's diminished concentration, and if such is deemed not significant, the basis for such a finding.  The only reference made by the ALJ with regard to plaintiff's alleged concentration impairment was his cite to a March 1998 medical record from Dr. Michael Jenkins wherein it was noted that plaintiff reported "poor concentration."  (Tr. 16).  Plaintiff, however, not only testified to, but had documentation in her medical records, regarding difficulties in concentration.  Although defendant argues these concentration difficulties are not themselves disabling, the question is not whether such concentration deficiencies are disabling, but whether such deficiencies affected plaintiff's RFC and her ability to work.  The concentration difficulties should have been addressed by the ALJ, particularly since plaintiff was found to have a severe impairment of depression.  The administrative decision does not address whether such severe impairment only involved "social functioning" and not "concentration" and if so, the basis for such determination.  If the concentration difficulties were not discredited by the ALJ then they should have been

---

[11]Plaintiff also cites to a Medication Follow-up record as medical evidence that she experiences a sufficient degree of lack of concentration which would limit her ability to work.  (Tr. 212, April 9, 1999).  The undersigned, however, has been unable to find a reference to an inability of plaintiff to concentrate in this record.

included in the hypothetical to the VE.  They were not and it cannot be said that the failure to address such deficiencies was harmless in light of the jobs identified by the VE.  The job of surveillance system monitor does not appear to require extensive social interaction or more than simple instructions, but such work would appear to require an ability to concentrate in order to view monitors on a sustained and continual basis.  It is not as clear whether the job of pager would require the same level of concentration, but it cannot be said that it does not.  Not only did the ALJ fail to cite and address records from plaintiff's treating medical health provider regarding plaintiff's decreased level of concentration, he did not rebut such records.  The evidence of plaintiff's daily activities does not establish an ability to concentrate to the degree that the treating physician's findings can be disregarded.  Consequently, it was error for the ALJ to not identify lack of concentration as an impairment demonstrated in the medical records, and address it.  This claim in plaintiff's second ground should be GRANTED.  Upon remand, the ALJ should address the medical records indicating a reduction in plaintiff's ability to concentration, evaluate such records, and determine whether any such deficiencies affected plaintiff's RFC and ability to work.

The ALJ also referenced, in his recitation of the medical evidence, eight (8) medical records reflecting GAFs in the 50-65 range in his decision.[12]  (Tr. 16-18).  Plaintiff argues it was error for the ALJ to fail to acknowledge, reference, or attribute any significance, in his decision, to her diagnosed GAFs in the 40-50 range, which indicated a considerably more serious degree

---

[12]Above 60, a GAF indicates a person operating with no more than mild symptoms whose ability to work would not be significantly impaired.  The range of 51 to 60 is described as "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co workers)."

of impairment.[13]  Plaintiff cites the Court to three (3) medical entries wherein plaintiff's GAF

was assessed in the 40-49 range.[14]  (Tr. 235, March 20, 1998 - GAF 41; 221, September 3, 1998 -

GAF 45; 414, August 9, 2000 - GAF 40).[15]  The ALJ did not cite to these 40-49 range GAFs in

his recitation of the medical record as the basis for his determination of plaintiff's RFC.  At the

hearing, plaintiff's attorney initiated the following questioning:

> Q.     Thank you, sir.  Mr. Cash, do you feel comfortable testifying on the basis
>        of GAF assessments?
>
> A.     Yes.  I do use GAF assessment scores as a part of Vocational testimony.
>
> Q.     Okay.  Let me ask you, if a person – Let's assume, if you would, the
>        Judge's first hypothetical, which seems to be exertionally light work.
>
> A.     That's correct.
>
> Q.     With a couple of other limitations.  If with that exertional level, you were
>        to combine a GAF of a 50 to 60 range, as a result of emotional
>        impairment, would the person be able first to – so described in the first
>        [hypothetical], do the past relevant work at this point?
>
> A.     In my opinion, yes.  There would be some erosion consistent with past
>        testimony.  A GAF between 50 and 60, in my opinion, is a mild degree of
>        impairment.  I would expect an erosion in the database of the available job
>        base of about 20 percent.

Plaintiff's representative acknowledges he did not question the VE as to any effect a GAF

between 40 and 50 would have on the database of available jobs, yet contends it was error for the

ALJ to cite to, or attribute any significance to, her GAFs in the range of 40-50, in his decision.

---

[13] The range of 41 to 50 is described as "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

[14] The undersigned notes another entry of GAF 45 on June 16, 1998.  Tr. 222.

[15] The undersigned also notes there appears to be six (6) entries finding GAFs in the 50-59 range, and thirteen (13) entries finding GAFs in the 60-69 range.

Plaintiff appears to argue the ALJ's failure to "mention" the ratings in the 40-50 range was evidence that the ALJ did not fulfill his "duty to fairly consider all the evidence."

While an ALJ is not required to cite to each and every record in his or her decision, the ALJ is required to fairly consider all the evidence. Here again, the evidence relating to plaintiff's mental functioning capacity was not sufficiently addressed at the administrative level. A psychiatrist diagnosed plaintiff with GAF scores of 50 or below on at least five (5) dates between March 1998 and December 1999. In his decision, the ALJ referenced only the higher GAF diagnoses. Consequently, it is impossible to tell whether the ALJ considered and rejected, or simply overlooked, the lower GAF scores. It was error for the ALJ to fail to reference, address, or evaluate these diagnoses and whether such diagnoses affected plaintiff's RFC and her ability to work. This claim in plaintiff's second ground should also be GRANTED. Upon remand, the ALJ should address the medical records reflecting plaintiff's GAF scores of 40-50, evaluate such records, and discuss the erosion, if any, such scores would have on the available job base.

V.
RECOMMENDATION

It is the RECOMMENDATION of the undersigned United States Magistrate Judge to the United States District Judge that the decision of the defendant Commissioner be REVERSED and REMANDED for consideration consistent with this Report and Recommendation.

VI.
INSTRUCTIONS FOR SERVICE

The District Clerk is directed to send a copy of this Report and Recommendation to plaintiff's attorney of record and the Assistant United States Attorney by the most efficient

means available.

IT IS SO RECOMMENDED.

ENTERED this 9th day of September 2005.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## \* <u>NOTICE OF RIGHT TO OBJECT</u> \*

Any party may object to these proposed findings, conclusions and recommendation.  In the event a party wishes to object, they are hereby NOTIFIED that the deadline for filing objections is eleven (11) days from the date of filing as indicated by the file mark on the first page of this recommendation.  Service is complete upon mailing, Fed. R. Civ. P. 5(b), <u>and</u> the parties are allowed a 3-day service by mail extension, Fed. R. Civ. P. 6(e).  Therefore, any objections must be <u>filed</u> **on or before the fourteenth (14th) day after this recommendation is filed**.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b); R. 4(a)(1) of Miscellaneous Order No. 6, as authorized by Local Rule 3.1, Local Rules of the United States District Courts for the Northern District of Texas.

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).